NOT FOR PUBLICATION                    [Docket No. 87 & 88]

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

CHESTER A. KING, et al.,

        Plaintiffs,

    v.

CITY OF GLOUCESTER, et al.,

        Defendants.

Civil No. 03-5863 (RMB)

OPINION

APPEARANCES:

Sharon A. King, Esq.
King & King, LLC
231 S. Broad Street
Woodbury, NJ 08096
        Attorneys for Plaintiffs

Linda A. Galella, Esq.
Allan E. Richardson, LLC
915 Haddon Ave.
Collingswood, NJ 08109
        Attorneys for Defendants Monroe Township, Chief Edwin Berwick, Howard
        Weimer, John Rumpf and Craig Monahan

**BUMB**, United States District Judge:

**INTRODUCTION:**

    This matter comes before the Court upon two motions: 1) a motion for summary

judgment by Defendants, Jon Rumpf, Craig Monahan and Howard Wiemer (hereinafter

collectively referred to as the "individual Defendants"), and 2) a motion for summary judgment

1

by Monroe Township and Chief Edwin Berwick (hereinafter collectively as the "Township" or

"Municipal Defendants").  This Court will briefly set forth the facts pertinent to these motions

and discuss the motions in turn.


**FACTUAL BACKGROUND:[1]**

This case arises out of a series of events that took place between August 8, 2003 and

August 9, 2003, and ended with the tragic death of Bernard King.  The above-captioned action

has been brought by Chester King and Elizabeth Darden, the parents of Bernard King, in their

individual capacities and as co-administrators of his estate.

Bernard King (hereinafter "Bernard") had a history of mental illness and had been

diagnosed with bipolar disorder.  On multiple occasions, the King family called the Monroe

Township Police ("MTPD") for assistance.  For example, in 2002, the police were called by

Chester King because his son was outside his house wielding a samurai-style sword.  Defs.' Ex.

R.  Bernard was arrested and taken to Underwood Hospital for a psychiatric evaluation.  Id.

Officer Craig Monahan ("Monahan"), a Defendant in this case and party to the instant motion,

was one of the officers who escorted King to the Hospital.  Pls.' Resp. SOF at ¶ 13.[2]  While at the

Hospital, Bernard told Monahan that he was ready to leave and threatened that he could kill

Monahan because he was a "black belt."  Pls.' Ex. C at 125:22-129:5.

On March 26, 2003, Bernard ransacked the home of his father and stepmother, Claudette

[1] The facts are derived from the parties' Rule 56.1 Statements, their exhibits and their
motion papers and are set forth in a light most favorable to the Plaintiffs.

[2] "Pls.' Resp. SOF" refers to the Defendants' statement of material facts and the
Plaintiffs' response thereto.

2

King.  Defs.' Ex. T.  He threw household furniture into the cellar, garage and lawn and engaged in other destructive behavior.  Chester and Claudette King contacted the MTPD and Bernard was handcuffed and taken to Underwood Hospital.  Id.  Following this incident, Claudette King applied for and was granted a temporary restraining order ("TRO").  Pursuant to the TRO, Bernard was prohibited from having contact with Chester King, Claudette King, or Donald Davis (Claudette King's son), required to remain in compliance with a "psych treatment team," and prohibited from possessing weapons.  Pls.' Ex. R.

On April 7, 2003, Bernard made several calls to his father's home in violation of the TRO.  Mrs. King filed a complaint with the MTPD. Pls.' Ex. X.  The following evening, Bernard went to his father's home and began knocking on the door.  Claudette King saw Bernard through the window and made her way next door to her son Davis' house.  911 was called and MTPD officers responded to the King home.  According to the police report, dispatch radioed that Bernard had left the residence in a blue Ford pickup truck.  Pls.' Ex. I.  Sgt. Howard Wiemer ("Wiemer") pulled over a vehicle matching that description.  Weimer was joined at the vehicle stop by two other officers, Jon Rumpf, ("Rumpf"), and Craig Monahan.  Before arriving, Monahan informed Rumpf that Bernard was a black belt that to "be on his toes" and told Rumpf about prior interactions with Bernard.  Pls.' Resp. SOF at ¶ 18.  Upon arriving to the scene, Monahan observed that Bernard's demeanor was calm and polite.  Id. at ¶ 19.  Officers Monahan and Rumpf transported Bernard to the MTPD.  Id. at ¶ 20.

Once at the station, Bernard was handcuffed to a bench and continued speaking in a friendly manner with the officers.  Id. at ¶¶ 21-22.  Rumpf, who had no prior interactions with Bernard,  prepared the paperwork and processed Bernard (which included a review of the TRO).

3

Id. at ¶ 24.  No Prisoner Intake/Medical Screening Report was completed.  Rumpf did not check any records regarding Bernard's past history with the MTPD.  Claudette King later arrived at the station with her son Davis.  Mrs. King informed Rumpf that Bernard was bipolar and had previously thrown furniture out of the house.  Id. at ¶ 32.  She also told Rumpf that Bernard was having problems and should have been taking medication.  Pls.' Ex. E at 39:14-20.

Rumpf spoke to Bernard about whether he should be taking medication.  Id. at 45:7-9. Bernard advised Rumpf that he was not taking medication and that he stopped taking it "some time ago."  Id. at 45:13-17 & 46:4-12.  Rumpf testified that Bernard displayed no signs "to show that he needed medication" and he "showed no signs of mental distress." Id. at 52:9-16. Claudette King testified that she requested that Bernard be taken to the hospital because he was sick.  Pls.' Ex. C at 61:10-15.  Rumpf stated, however, that Claudette King never requested that Bernard be taken to the hospital or given medical treatment.  Pls.' Ex. E at 44:35-55:5.

It is undisputed that Mrs. King was informed that Bernard would be taken to the county jail unless she posted bail in the amount of $250.00; Mrs. King refused to post bail.  Defs. Ex. E at 62:8-12.  As Mrs. King departed the police station, Chester King arrived - he also refused to post bail.  Rumpf arranged for Bernard's transfer to the Gloucester County Sheriff's Department. Officer Barry Fell of Gloucester County arrived at the MTPD to transfer Bernard.  Pls.' Resp. SOF at ¶ 51.  Fell was not informed of Bernard's history of mental illness.  Once in the custody of Gloucester County, Bernard was admitted to the jail and allegedly began exhibiting bizarre behavior.  The Gloucester County jail officers applied force to control Bernard and he was brought to a holding cell where he later died of positional asphyxia.  Defs.' Ex. K.

While this action was originally filed against multiple defendants including the County of

Gloucester, Gloucester County Jail, the New Jersey Department of Corrections, and several individuals, the only defendants that remain in this action are Monroe Township, Chief Edwin Berwick, Jon Rumpf, Craig Monahan and Howard Wiemer.

**APPLICABLE STANDARD:**

The remaining Defendants have moved for summary judgment. Summary judgment shall be granted if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c); Hersh v. Allen Products Co., 789 F.2d 230, 232 (3d Cir. 1986). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material" only if it might affect the outcome of the suit under the applicable rule of law. See id. Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment. See id. "In making this determination, a court must make all reasonable inferences in favor of the non-movant." Oscar Mayer Corp. v. Mincing Trading Corp., 744 F. Supp. 79, 81 (D.N.J. 1990) (citing Meyer v. Riegel Prods. Corp., 720 F.2d 303, 307 n.2 (3d Cir. 1983)). "At the summary judgment stage the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249.

**DISCUSSION:**

**1) Individual Defendants' Motion For Summary Judgment**

*a) Inadequate Medical Care*

5

Plaintiffs contend that Officers Rumpf, Monahan and Weimer deprived Bernard King of his Fourteenth Amendment right to receive adequate medical treatment while in the custody of MTPD.  In their brief in opposition to this motion, Plaintiffs clarify their position.  They "are not claiming that Bernard was not provided the appropriate treatment by health care professionals, but the denial of even a medical assessment to determine whether he was capable of being incarcerated or whether he had medication needs."  (Pls.' Br. at 23 n.85).

When bringing an action under 42 U.S.C. § 1983, a Plaintiff must satisfy a two-prong test by showing that: 1) the conduct complained of was committed by a person acting under color of state law, and 2) the conduct deprived that person of rights guaranteed by the United States Constitution.  West v. Atkins, 487 U.S. 42, 48 (1988).  The parties do not dispute that the individual Defendants were acting under color of law.  The focus of the dispute is whether Bernard was deprived of his constitutional right to adequate medical treatment.  Because Bernard was a pretrial detainee at the time of the incident, the applicable standard for denial of appropriate medical care is found under the Fourteenth Amendment.  Hubbard v. Taylor, 399 F.3d 150, 158 n.13 (3d Cir. 2005).

In evaluating this case, the Court looks for guidance from Estelle v. Gamble, 429 U.S. 97, 103 (1976) .  See Natale v. Camden County Correctional Facility, 318 F. 3d 575, 581-52 (3d Cir. 2003) (evaluating Natale's Fourteenth Amendment claim for inadequate medical care under the standard used to evaluate similar claims brought under the Eighth Amendment).  Additionally, the Court is aware that "the due process rights of a [pretrial detainee] are at least as great as the Eighth Amendment protections available to a convicted prisoner."  Hubbard, 399 F.3d at 166.[3]

---

[3] The exact contours of the analysis are somewhat unclear as recent guidance is mixed. A very recent opinion in the Third Circuit addressing this issue, Watkins v. Cape May Cty.

Correctional Center, No. 06-4540, 2007 U.S. App. LEXIS 17472 (3d Cir. 2007), appears to approve the familiar Estelle standard. Id. (stating that "[a] claim by a pretrial detainee. . . is analyzed under the Due Process Clause of the Fourteenth Amendment" and "where the challenge concerns medical care received at the facility, the applicable standard is the one set forth in Estelle v. Gamble." ). While this case is unpublished, this Court found it to be one of the most recent decisions. In contrast, in Montgomery v. Ray, 145 Fed. Appx. 738 (3d Cir. Apr. 20, 2005), the Third Circuit, taking cues from Hubbard, remanded the matter to the district court for failure to properly utilize the Fourteenth Amendment due process standard applicable to a pretrial detainee. Id. ("the proper standard for examining [inadequate medical treatment] is the standard set forth in Bell v. Wolfish, 4511 U.S. 520 (1979); i.e., whether the conditions of confinement, (or here, inadequate medical treatment) amounted to punishment prior to an adjudication of guilt.").

        In light of this uncertainty, and keeping in mind that the parties to this motion have only presented arguments based on the familiar Estelle "deliberate indifference" standard, this Court finds it prudent to not only address the parties' arguments, to be discussed above, but also to look to the standard discussed in Hubbard for additional analysis. See e.g., Chadwick v. Court of Common Pleas of Delaware Cty., No. 05-1443, 2006 U.S. Dist. LEXIS 40125 at *21 (E.D. Pa. June 15, 2006) ("whether this [Estelle v. Gamble] standard now controls due process claims brought by nonconvicted individuals or not, it provides a useful reference point for our analysis, in that Plaintiff's due process rights are 'at least as great' as the Eighth Amendment protection accorded convicted prisoners.").

        In assessing whether a Due Process violation (related to a detainee's medical needs) occurred,

> [a] court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose. Absent a showing of an expressed intent to punish on the part of the detention facility officials, that determination generally will turn on whether [it has] an alternative purpose . . . and whether it appears excessive in relation to [that] purpose . . . . Thus, if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to "punishment." Conversely, if a restriction or condition is not reasonably related to a legitimate goal - if it is arbitrary or purposeless - a court may permissibly infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees qua detainees.

Hubbard, 399 F.3d at 158 (quoting Bell v. Wolfish,  441 U.S. 520, 538-39 (1979)).

        Evaluating the facts in a light most favorable to the Plaintiffs, this Court finds that no issue of fact exists as to whether Bernard's treatment by either Weimer, Monahan or Rumpf amounts to punishment before an adjudication of guilt.  Taking into consideration the totality of circumstances, Plaintiffs have produced no evidence to show (or presented any arguments) that Bernard was not given a medical assessment in order to punish him.  See Hubbard, 339 F.3d at

7

In Estelle v. Gamble, 429 U.S. 97, 103 (1976), the Supreme Court concluded that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment."  Id. at 104 (quoting Gregg v. Georgia, 428 U.S. 153, 173 (1976)).  The Estelle Court noted, however, that its conclusion does not mean "that every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment."  Id. at 105.   Neither mere allegations of malpractice nor "mere disagreement as to the proper medical treatment" present a constitutional violation.  Monmouth County Correctional Institution Inmates v. Lanzaro, 834 F.2d 326, 346 (3d Cir. 1987).  Instead, to demonstrate an "unnecessary and wanton infliction of pain" an inmate

---

160.  Thus, this Court must ask whether the restriction at issue "which may appear to be punitive, was really an incident of a legitimate nonpunitive objective."  Fuentes v. Wagner, 206 F. 3d 335, 342 (3d Cir. 2000); see Dahlan v. Dept. of Homeland Security, 215 Fed. Appx. 97, 100 (3d Cir. Feb. 6, 2007) ("[a]bsent a showing of express intent to punish, the determination will normally turn on whether the conditions have an alternative purpose and whether the conditions appear excessive in relation to that purpose.").  Here, the alleged "punitive"condition was the alleged failure to provide Bernard with a medical assessment.  Bernard was not given a medical assessment because he stated that he was not currently taking medication and because he displayed no signs "to show that he needed medication" and he "showed no signs of mental distress." Pls.' Ex. E at 52:9-16.  MTPD policy, SOP #76 (discussed further infra), states that "a subject should be evaluated by a mental health professional, on the basis of the officer's personal observations, and where there is reasonable cause to believe that a subject is in need of involuntary commitment." Defs.' Ex. M. at 76:6.1.  Moreover, involuntary commitment is required only where a detainee is a threat to himself, others or property.  Id. at 76:1.4.  This policy is based on the need to "balance the basic value of liberty with the need for safety and treatment."  Id. at 76:1.3.  Plaintiffs make no argument that a rational relationship is lacking.  Indeed, this Court finds that no reasonable jury could find that this policy is not rationally related to the legitimate purpose of balancing a detainee's civil rights and right to medical care where necessary or that the policy was arbitrary or purposeless.  As such, Plaintiffs have failed to show that a issue of material fact remains regarding a violation of Bernard's Due Process rights as to any of the individual Defendants.

must show that prison officials have acted with "deliberate indifference" and that the prisoner's injury or illness is serious. Id. at 104; Government of the V.I. v. Martinez, 239 F.3d 293, 301 (3d Cir. 2001).

Where prison officials deny reasonable requests for medical treatment, and "such denial exposes the inmate 'to undue suffering or the threat of tangible residual injury,' deliberate indifference is manifest." Monmouth County Correctional Institution Inmates, 834 F.2d at 346 (quoting Westlake v. Lucas, 537 F.2d 857, 860 (6th Cir. 1976). Additionally, where prison authorities are aware of the need for medical care and intentionally refuse to provide that care, the deliberate indifference standard is satisfied. Id. (quoting Ancata v. Prison Health Services, Inc., 769 F.2d 700 (11th Cir. 1985)).

As an initial matter, this Court notes that Plaintiffs' brief does not set forth any arguments or evidence as to how Wiemer and Monahan were allegedly deliberately indifferent to King's medical needs. Instead, Plaintiffs' arguments focus almost exclusively on Rumpf and, in fact, Plaintiffs' brief states that "[a] reasonably jury could conclude that Rumpf strongly suspected that Bernard needed medical attention and acted in reckless disregard to this need." Pls.' Br. at 30.

This Court finds that there is insufficient evidence from which a reasonable jury could find that either Wiemer or Monahan were deliberately indifferent to a serious medical need. It is clear that the events of August 8, 2003, constituted Wiemer's first interaction with Bernard. Defs.' Ex. A at 106:1-45. Moreover, Wiemer had nothing to do with processing Bernard while at the MTPD. Id. at 104:23-25. Plaintiffs' only averment with regard to Wiemer is that "Wiemer provided no guidance to Rumpf in his assessment and handling of Bernard's medical needs." Pls.' Br. at 32. In other words, Plaintiffs seek to hold Wiemer liable because he was responsible

9

for overseeing Rumpf and left the job after his shift without reviewing Rumpf's reports. However, Plaintiffs have pointed to no evidence that Wiemer was aware of a serious medical need and was deliberately indifferent to that need or that Wiemer had personal knowledge of a medical need and acquiesced in the actions of Rumpf (who, Plaintiffs aver, was deliberately indifferent to Plaintiffs' need). As such, Wiemer cannot be held liable. See Wilson v. Horn, 971 F. Supp. 943, 947 n.2 (E.D. Pa. 1997) ("to be liable under § 1983, they must have participated in or had personal knowledge of and acquiesced in the actions which plaintiff claims to have deprived him of his constitutional rights. [] The mere fact that a defendant may hold a supervisory position is insufficient to find liability.") (citations omitted).

With regard to Monahan, Plaintiffs make no specific arguments and set forth no evidence as to how Monahan was deliberately indifferent to Bernard. Instead, their arguments focus almost exclusively on Rumpf. To withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party. Anderson, 477 U.S. at 256-57. A party opposing summary judgment must do more than just rest upon mere allegations, general denials, or vague statements. Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir. 2001). At the summary judgment stage, a plaintiff must produce evidence "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322-23.

The only evidence set forth with regard to Monahan is that he was aware of King's previous mental illness problems because he had helped escort King to Underwood Hospital for a psychiatric evaluation. Plaintiffs have set forth no evidence, however, that on August 8 and 9,

10

2003, Monahan was aware that Plaintiff had a serious medical need and that Monahan acted with deliberate indifference.  In fact, the evidence set forth by Defendants demonstrates that King displayed no signs of distress during his interactions with Monahan on the date in question.  King was "outgoing, talkative and friendly" and "upbeat" while in his presence.  See Defs.' Ex. B at 157-158.  Because the Plaintiffs have failed to set forth anything more than vague allegations against Monahan, this Court finds that no reasonable jury could find that Monahan was deliberately indifferent to King's medical needs in violation of the Fourteenth Amendment.

As stated above, Plaintiffs' arguments center on the alleged actions or inactions of Defendant Rumpf.  Plaintiffs state that they have met their burden of showing that Rumpf strongly suspected that Bernard needed medication and declined to verify this suspicion.  This, they contend, is sufficient to demonstrate a constitutional violation.  Despite the fact that Bernard denied needing medication, Plaintiffs assert that Rumpf had subjective knowledge that the claim of Bernard's medication need was true because Mrs. King told him that Bernard was taking medication for his disorder, and the TRO stated that Bernard was to "remain in compliance with the psych treatment team."  This, combined with the fact that Monahan told Rumpf about his prior encounters with Bernard, Rumpf's failure to check dispatch records (that would show ongoing psychiatric problems), or complete a medical screening form leads Plaintiffs to the conclusion that "Rumpf ignored the substantial risk of harm to Bernard and transferred him to the county jail without sending him for a hospital determination of this need." Pls.' Br. at 26.

This begs the question of what Bernard's serious medical need was at the time of his arrest on April 8, 2003.  The very fact that Bernard was mentally ill person who should be on medication appears to be the serious medical need requiring attention.  Plaintiffs contend that a

medical need not require immediate attention to suffice.  For a medical need to be "serious" pursuant to the second prong of the <u>Estelle</u> test, Plaintiffs must show that the need is "'one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention.'" <u>Monmouth County Correctional Institution Inmates</u>, 834 F.2d at 347 (<u>quoting</u> <u>Pace v. Fauver</u>, 479 F.Supp. 456, 458 (D.N.J. 1979), <u>aff'd</u>, 649 F.3d 860 (3d Cir. 1981)).  Additionally, "if unnecessary and wanton infliction of pain results as a consequence of denial or delay in the provision of adequate medical care, the medical need is of the serious nature contemplated by the [Eighth [A]mendment." <u>Id.</u> Also, "where denial or delay causes an inmate to suffer a life-long handicap or permanent loss, the medical need is considered serious." <u>Id.</u>

        Defendants argue that there is no evidence that King was diagnosed as requiring immediate treatment and there is no evidence that King's condition was so manifest that a layman would have known attention was needed (as evidenced by testimony in the record that Bernard appeared calm and did not exhibit unusual behavior while in custody of the MTPD). Plaintiffs, however, point to the moving Defendants' own expert, Dr. Gary Glass, who concluded that "certainly there was no doubt about [Bernard's] mental health history or his need for treatment."  Pls.' Ex. CC at 7.  While Bernard's needs may not have been obvious to a lay person, Dr. Glass' statement leads this Court to the conclusion that a reasonable jury could find that Bernard had a need that was "one that has been diagnosed by a physician as requiring treatment." <u>Monmouth County Correctional Institution Inmates</u>, 834 F.2d at 347.  As such, an issue of fact exists as to whether Bernard had a serious medical need.

        Even if a reasonable jury could find there was a serious medical need, however, no

reasonable jury could find that Rumpf was either deliberately indifferent to such a need or subjected Bernard to unnecessarily and wanton infliction of pain.  Without such a finding, there is no constitutional violation.  See White v. Napoleon, 897 F.2d 103, 108-09 (3d Cir. 1990) ("[o]nly 'unnecessary and wanton infliction of pain,' . . . or 'deliberate indifference to the serious medical needs' of prisoners, . . . are sufficiently egregious to rise to the level of a constitutional violation.") (internal citations omitted).  The evidence shows that Rumpf indeed tried to verify whether Bernard needed medication, when he asked Bernard directly.  The record is undisputed that Bernard denied needing any such medication and that he told Rumpf he stopped taking it some time ago.  Pls.' Ex. E at 45:7-17 & 46:4-12.  Moreover, Rumpf testified that Bernard displayed no signs "to show that he needed medication" and he "showed no signs of mental distress." Id. at 52:9-16.  Plaintiffs state that Bernard's calm state is of no moment because he was calm and cooperative with the police during his prior interactions with them.  It is, however, undisputed that this was Rumpf's first time interacting with Bernard.  Pls.' and Defs.' SOF  at ¶ 24.

The individual Defendants argue that "[P]laintiffs are asking this Court to place a duty on local police departments of involuntarily sending ALL detainees with some known history of mental illness to a mental health center for evaluation and treatment."  Ind. Defs.' Br. at 1.  This Court agrees.  This, however, is not what the law requires; instead, the law requires that a state actor not be deliberately indifferent to a serious medical need. Estelle v. Gamble, 429 U.S. 97, 103 (1976).[4]  Plaintiffs focus on the terms of the TRO that required Bernard to "remain in

---

[4] This, again, is the "floor" of protections afforded pretrial detainees; as discussed supra, "a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law." Bell v. Wolfish, 441 U.S. 520, 535-36, 99 S. Ct. 1861, 60 L. Ed. 2d 447 (1979). As discussed in footnote 3, Plaintiffs have similarly failed to create a genuine issue of material fact

compliance with psych treatment team," and that because Bernard was not in compliance, the Defendants should have taken him to the hospital.   Yet there is no evidence before this Court that Rumpf (or any other Defendant) had the knowledge that Bernard was not in compliance since he was calm and showed no signs of distress.   Moreover, Rumpf, knew that Bernard would be appearing before a judge within a few hours on the TRO and facilitated Mrs. King's contact with the Judge.   See Defs.' Ex. D at  33:7-11 (Rumpf's testimony that "[Claudette King] asked me what was going to happen to Bernard and [told me] that they were due in court the next morning for a violation of the order."); id. at 43:22-44:10 (Rumpf's testimony that he contacted Judge Lacovara and that Claudette and the Judge spoke).[5]   Plaintiffs admit in their brief that they "anticipated that the judge presiding at the hearing scheduled less than eight hours away, would involuntarily commit Bernard to a psychiatric hospital."  Pls.' Br. at 15.  From this, it appears that Plaintiffs are requesting that Defendants make a judgment call that the judge presiding at the hearing would be making "less than eight hours away."  There is no evidence that a refusal to do so constituted deliberate indifference.

Even if this Court were to find that Rumpf failed to respond to Bernard's serious medical need, this Court holds that Rumpf is entitled to qualified immunity.  According to the Third Circuit, as stated in Couden v. Duffy, 446 F.3d 483 (3d Cir. 2005), in order to receive the benefits of said immunity:

a court must first decide whether the facts, taken in the light most favorable to the

as to whether the restriction at issue constituted punishment before the adjudication of guilt.

[5] Notably, after Claudette King spoke to Judge Lacovara (and presumably conveyed the same concerns to the Judge as she had to Rumpf), the Judge "placed $250- cash bail on Bernard to go on a warrant for contempt and harassment."  He did not order that Bernard be taken to the hospital.  Defs.' Ex. D 44:8-10.

14

plaintiff, demonstrate a constitutional violation.  Curley v. Klem, 298 F.3d 271,
277 (3d Cir. 2002) (citing Saucier, 533 U.S. at 201). If so, the court next
determines whether the constitutional right in question was clearly established.
Id. at 277 (citing Saucier, 533 U.S. at 201).  "The relevant, dispositive inquiry in
determining whether a right is clearly established is whether it would be clear to a
reasonable officer that his conduct was unlawful in the situation he confronted."
Saucier, 533 U.S. at 202.  "If the officer's mistake as to what the law requires is
reasonable," the officer is entitled to qualified immunity.  Id. at 205.

Couden, 446 F.3d at 492.

Therefore, in evaluating the qualified immunity issue, this Court will first ask whether,

the facts alleged show that the Rumpf deprived Bernard of a constitutional right.  Saucier v. Katz,

533 U.S. 194, 201 (2001).  If the answer is yes, the Court must next ask if such right was clearly

established at the time of the events in question, i.e., in light of preexisting law - was the

unlawfulness apparent.[6]  Wilson v. Layne, 526 U.S. 603, 614-15 (1999).  This task must be

"undertaken in light of the specific context of the case."  Saucier, 533 U.S. at 201.  The Court

must also ask, would it "be clear to a reasonable officer that his conduct was unlawful in the

situation he confronted," or was there a "reasonable, but mistaken belief[] as to the facts

establishing the existence of probable cause."  Id. at 202 & 206.

With regard to Rumpf, even if this Court were to assume a constitutional violation

existed, the facts presented here countenance in favor of a grant of qualified immunity: 1) it is

unclear that the right to be given mental health treatment and a hospital evaluation, when

someone does not appear to be in distress and denies needing medication, was clearly

established, and 2) a officer could reasonably, even if mistakenly, have concluded that Bernard

did not require medical attention or an evaluation.

---

[6]  This does not mean, however, that the same situation must have been previously
declared lawful or unlawful.  See Couden, 446 F.3d at 495.

Plaintiffs make a broad and vague assertion that "[t]his constitutional right to medical care for his serious medical need was clearly established at the time of Bernard's arrest" and that "reasonable officers in the defendants' situation would have known that the failure to provide Bernard with much needed medical care was unlawful."  However, whether a right is clearly established is not definitively resolved by broad propositions, instead, the question must be examined "in light of the specific context of the case."  <u>Saucier</u>, 533 U.S. at 201.  Moreover, a right is clearly established if it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. <u>Id.</u> at 202.   Plaintiffs have failed to introduce evidence to show that a reasonable officer would believe his conduct was unlawful based on the situation he confronted.  Here, Rumpf asked Bernard about his medical condition.  Rumpf informed the Kings that, unless they posted bail, Bernard would be transported to Gloucester County and knew that the next morning, a Judge would determine the appropriate course of action. Further, Rumpf facilitated Claudette King's call with the Judge and, notably, after speaking with Mrs. King the Judge set bail and did not order an immediate transport to a hospital.  Certainly, Rumpf could reasonably have concluded that Bernard did not require medical attention and that his medical care needs would be addressed by the court the following morning.   Because qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law,"  <u>Malley v. Briggs</u>, 475 U.S. 335, 335, 106 S. Ct. 1092, 89 L. Ed. 2d 271 (1986), and no issue of fact exists as to whether the officers were plainly incompetent or knowingly violated the law, qualified immunity applies.

### *b) State-Created Danger Theory*

16

In their moving papers, Defendants assert that Plaintiffs have failed to show a genuine issue of fact exists as to whether Plaintiffs can recover under 42 U.S.C. § 1983 pursuant to the "state-created danger theory."  Plaintiffs have failed to oppose Defendants' motion on this claim. Because this portion is unopposed and Defendants' arguments are well supported, summary judgment will be granted.  See Local 825 v. Tuckahoe Sand & Gravel, 2007 U.S. Dist. LEXIS 44613 at * 29-30 (D.N.J. June 20, 2007) (collecting cases supporting the proposition that failure to oppose constitutes abandonment of a claim).[7]

### 2) Township Defendants' Motion For Summary Judgment

Count Two of Plaintiffs' Amended Complaint asserts claims against Monroe Township and the Monroe Township Police Chief, Edwin Berwick.  Plaintiffs aver that the Township and Chief Berwick are liable for failing to adequately train and supervise the Monroe police officers and developing and maintaining policies or customs "exhibiting deliberate indifference to the constitutional rights of citizens" in the department's custody.

Local government units generally are not liable under § 1983 solely on a theory of respondeat superior.  See City of Oklahoma City v. Tuttle, 471 U.S. 808, 824 n.8 (1985); Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690-91, 694 (1978) (municipal liability attaches only "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury" complained of); Natale v. Camden County Corr. Facility, 318 F.3d 575, 583-84 (3d Cir. 2003).

The Supreme Court in Monell created a two path track to municipal liability under

_____

[7] Moreover, it appears that this was not even a claim asserted by Plaintiffs in their complaint.

section 1983 - policy or custom. As set forth by the Third Circuit:

> A government policy or custom can be established in two ways. Policy is made when a "decision maker possessing final authority to establish municipal policy with respect to the action" issues an official proclamation, policy or edict. A course of conduct is considered to be a "custom when, though not authorized by law, such practices of state officials [are] so permanent and well settled" as to virtually constitute law.

Andrews v. City of Philadelphia, 895 F.2d 1469, 1480 (3d Cir. 1990) (internal citations omitted).

Furthermore, custom may be established by evidence of knowledge and acquiescence.

See Fletcher v. O'Donnell, 867 F.2d 791, 793 (3d Cir. 1989). The key to holding a municipality liable under a custom theory is that the policymaking official knew, or should have known, about the illegal practices, and therefore, tacitly authorized a custom of tolerating their officers' supposedly illegal activities. See Beck v. City of Pittsburgh, 89 F.3d 966, 973 (3d Cir 1996) (discussing tacit authorization of excessive force).

*a) Failure to Train*

Subsumed within the "custom" prong is inadequate police training procedures. The Supreme Court has held that the inadequacy of police training may serve as the basis for § 1983 liability "only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." City of Canton v. Harris, 489 U.S. 378, 388 (1989). In City of Canton, the Court stated:

> [I]t may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result the violation of constitutional rights, that the policymaker of the city can reasonably be said to have been deliberately indifferent to the need.

Id. at 390. However,

> it is not enough for a § 1983 plaintiff merely to identify conduct properly

18

attributable to the municipality. The plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the "moving force" behind the injury alleged. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights.

Bd. of the County Comm'rs of Bryan County v. Brown, 520 U.S. 397, 404 (1997).

A municipality's failure to train may amount to a violation where 1) policymakers know that employees will confront a particular situation; 2) that situation involves a difficult choice or history of employees mishandling, and 3) the wrong choice will frequently cause the deprivation of constitutional rights.  Carter v. City of Philadelphia, 181 F.3d 339, 357 (3d Cir. 1999). Moreover, unless the policy or custom at issue is, itself, unconstitutional, courts have generally held that "more proof than [a] single incident will be necessary . . . to establish both the requisite fault on the part of the municipality and the causal connection between the 'policy' and the constitutional deprivation."  City of Oklahoma City, 471 U.S. 808, 824 (1985).

While it is possible to maintain a failure to train claim without such a pattern, however, the burden is high.  Berg v. County of Allegheny, 219 F. 3d 261, 276 (3d Cir. 2000).  As stated in Bryan County, 520 U.S. at 409,

> [i]n leaving open. . . the possibility that a plaintiff might succeed in carrying a failure-to-train claim without showing a pattern of constitutional violations, we simply hypothesized that, in a narrow range of circumstances, a violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations. The likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights could justify a finding that policymakers' decision not to train the officer reflected 'deliberate indifference' to the obvious consequence of the policymakers' choice.

Id. at 409.

As an initial matter, it is not entirely clear what the constitutional violation complained of

19

is with regard to the municipal defendants.  If the complained of conduct is the failure to send Bernard for a medical evaluation, for the reasons discussed above, this Court has found that this did not result in a constitutional violation; no reasonable jury could find that the officers were deliberately indifferent to Bernard and there has been no showing that the treatment constituted punishment before the adjudication of guilt.  As Bernard suffered no constitutional violation, there is no basis for municipal liability.  See Brown v. Pa. Dep't of Health Emergency Med. Servs. Training Inst., 318 F.3d 473, 482 (3d Cir. 2003) ("for there to be municipal liability, there still must be a violation of the plaintiff's constitutional rights.").  Even if this Court were to assume, however, that a constitutional violation occurred or that the alleged violation complained of is actually the treatment of Bernard by the Gloucester Police, Plaintiffs have presented no evidence from which a reasonable jury could conclude that Monroe Township or Chief Berwick acted with deliberate indifference or that a Monroe Township custom or policy constituted the "moving force" behind the alleged constitutional deprivation.

    According to Plaintiffs, Monroe Township is liable because "training to identify detainees with serious medical needs is clearly inadequate as it is nonexistent." (Pls.' Br. at 43).  Further, officers were not trained on how to complete a medical screening report, required when an individual is taken into custody, which, Plaintiffs set forth, is evidenced by the testimony of Chief Christopher and Lt. Branda that these forms were rarely, if ever, used.[8]  Despite the fact that a formal policy existed requiring arresting officers to complete medical screening forms whenever an individual was taken into custody (Standard Operating Procedure 39:9.5), the practice of not completing these forms was so widespread that it constitutes a custom.  In support

---

[8] See Pls.' Ex. Q 86:10-87:4 & Ex. G 55:15-56:22.

of this argument, Plaintiffs cite to the testimony of Chief Domenic Christopher that the completion of these forms is not always done, see Pls.' Ex. Q at 86:10-87:4, and the testimony of Lt. Branda that there was no formal training on how to complete these forms.  Pls.' Ex. G 55:16-56:22.  Moreover, while there was training by the National Alliance on Mental Illness ("NAMI"), Plaintiffs highlight the testimony of Rumpf and Monahan, who testified that they were not in attendance.  This fact, Plaintiffs argue, is evidence that training was inadequate.  Plaintiffs categorically state that the inadequate training evinces Monroe Township's "cavalier approach to addressing detainee's medical needs" and that it "was inevitable that the constitutional rights of detainees such as Bernard, would be violated."  Pls.' Br. at 47.   It is clear that arguments for more or different training are not enough.  See City of Canton, 489 U.S. at 391 ("[n]either will it suffice to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct.").

Moreover, the failure to fill out the medical form - especially in light of the common practice of not filling out such forms except where detainees were placed in cells[9] - while arguably a custom - is not a custom that resulted in deliberate indifference to medical needs.  In fact, the evidence in this case is to the contrary.  Monroe Township had a policy on dealing with the mentally ill that Rumpf followed.  Monroe Township Standard Operating Procedure #76 makes clear that a person is in need of involuntary commitment where they are "an adult who is mentally ill, whose mental illness causes the person to be dangerous to self or dangerous to others or property and who is unwilling to be admitted to a facility voluntarily for care."  Defs.' Ex. M at 76:1.4.   There is no evidence in the record that Rumpf would have found that Bernard

---

[9] These forms were only completed when someone was going to be placed in a holding cell at the MTPD, which Bernard was not.  See Pls.' Ex. G 55:16-56:22.

was a danger to himself, others or property requiring involuntary commitment.  Rumpf testified

that Bernard would have been taken for treatment had he requested it[10] or if his demeanor gave

signs that he needed such attention including "[w]hether [he showed] any signs of mental

distress, his mood, his perception. . .  did he look like he was in danger of [sic] himself or in

danger of inflicting harm to anybody else or properly."  See Defs' Ex. D. at 92: 4-9.  Rumpf,

taking into these factors into consideration, as dictated by SOP #76, determined that Bernard

"showed no signs of any of that," which would call for involuntary hospitalization.  See id.

Moreover,  the undisputed facts shows that when Bernard had demonstrated that he might harm

himself, others or property in the past - he was taken for medical evaluation by members of the

MTPD.  For example, Bernard was taken to the hospital following the incident where he was

wielding a samurai sword and after ransacking his parents' home.  See Defs.' Exs. R & T.

     The evidence demonstrates that Rumpf did not ignore or react with indifference to the

information provided by Claudette King that Bernard was supposed to be taking medication.

Instead, Rumpf specifically asked Bernard if he needed medication and Bernard denied needing

it, indicating he had stopped taking it sometime ago.  Defs.' Ex. D at 45.  Rumpf also asked

Monahan if he had observed any medication in Bernard's truck.  Id. at 45:20-24.  While Plaintiffs

inveigh about the failure to complete the medical form, there is no evidence before this Court

that the failure to complete this form resulted in deliberate indifference to Bernard's medical

needs.   A review of the form, Exhibit T to Plaintiffs' brief, reveals that the officer, in this case

---

    [10] When asked, "If Claudette [King] had requested that Bernard be hospitalized for his mental illness, would you have been able to take him to the hospital?", Rumpf testified, "Under the circumstances we would have probably asked Bernard if he needed to seek medical attention. And if he refused and there were no signs, we would be infringing on his civil rights, no. Just because Claudette asks, no." Defs. Ex. D at 89:14-21.

Rumpf, would be required to make a visual assessment (looking for trauma, etc.) and an evaluation of "behavior status" i.e., mental status, violent acts or state of consciousness. Also, the detainee would be asked "are you sick," "under the care of a doctor" and "are you taking any medications." Pls.' Ex. T.

Plaintiffs have failed to demonstrate causation, that is, how completing this form would have made a difference in Rumpf's assessment; Rumpf testified that he evaluated Bernard to see if he was a danger to himself, others or property and asked Bernard if he was taking any medication. Moreover, Plaintiffs have argued that Rumpf was made aware of Bernard's previous problems and encounters with the MTPD by Monahan. See Pls.' Br. 11. Even construing the evidence in a light most favorable to Plaintiffs, Plaintiffs have produced no evidence that the completion of this form would have resulted in sending Bernard to the hospital - most, if not all, of the information that would have been gathered on the form was known to and assessed by Rumpf.

Additionally, the only evidence on the record before this Court relates solely to this single incident. Plaintiffs have produced no evidence whatsoever of similar past violations or a pattern and have not demonstrated that this is special type of case where evidence of past violations does not apply. In order to establish liability, plaintiff must show that Monroe Township Officials were aware of the problem and "either deliberately chose not to pursue [] alternatives or acquiesced in a long standing policy or custom of inaction in this regard." Simmons v. City of Philadelphia, 947 F.2d 1042, 1064 (3d Cir. 1991); see City of Oklahoma City, 471 U.S. at 824 (finding that one incident is insufficient where policy itself is not unconstitutional).

Thus, Plaintiffs have failed to demonstrate that the municipal defendants acted with

deliberate indifference to Bernard's medical needs.  Without evidence of deliberate indifference, there can be no municipal liability; "there must be a deliberate or conscious choice by the municipality not to train its employees before it may be held liable under section 1983. . .[i]t is not enough to allege that different training would have been more effective."  Galliano v. Borough of Seaside Heights, No. 03-1463, 2007 WL 979850 at *19 (D.N.J. Mar. 30, 2007) (internal citations and quotations omitted).

Even if Plaintiffs were correct, that there was indeed a lack of training on how to deal with mentally ill detainees that constituted a custom sufficient to show deliberate indifference, they fail to adequately demonstrate that this custom was the "moving force" behind the alleged constitutional violation.  See City of Canton, 489 U.S. at 391 ("for liability to attach. . .. the identified deficiency in the city's training program must be closely related to the ultimate injury.").  Plaintiffs argue that, had there been adequate training, the medical form would have been completed.  Had the form been completed, Rumpf would know about Bernard's medical history, and had he known about Bernard's history, Bernard would have been sent for treatment and not to jail.  If he was not sent to jail there would have been no "struggle with [Gloucester County] officers, that ultimately, led to Bernard's death." (Pls.' Br. at 47).

However, even if the form had been completed there is no evidence Bernard would have been taken to the hospital as a result.  It is undisputed that Monahan told Rumpf about his past interactions with Bernard and that Rumpf questioned Bernard as to his needs for medication. Bernard indicated that he was not taking any medication.  Rumpf also evaluated Bernard pursuant to SOP #76 and determined that he was not a threat to himself, others or property. Here, the link between the training deficiency and the violation is too attenuated.  Therefore,

24

Defendants are entitled to summary judgment as no reasonable jury could find that a policy or custom of Monroe Township was the "moving force" behind the alleged constitutional violation. See Bryan County, 520 U.S. at 400 ("in enacting § 1983, Congress did not intend to impose liability on a municipality unless deliberate action attributable to the municipality itself is the 'moving force' behind the plaintiff's deprivation of federal rights.").  This result is "consistent with the Court's narrow construction of municipal liability under 42 U.S.C. § 1983 since Monell, limiting municipal liability to only those constitutional torts actually caused by the municipality." Beck, 89 F.3d at 972.

> *b) Failure to Supervise*

Alternatively, Plaintiffs seek to impose municipal liability on Chief Berwick for failing to enforce his department's policy for the medical screening of detainees and its Internal Affairs Policy regarding investigation and discipline.  The deliberate indifference standard, discussed above, similarly applies to the failure to supervise analysis.  See Groman v. Township of Manalapan, 47 F.3d 628, (3d Cir. 1995).  Moreover, "a supervisor may be found individually liable under § 1983 if a failure to properly supervise and train the offending employee caused a deprivation of constitutional rights." Okocci v. Klein, 270 F. Supp. 2d 603, 612 (E.D. Pa. 2003).

With regard to Plaintiffs' claim that Berwick failed to enforce the Internal Affairs policy, Plaintiffs brief reveals that this complaint is related to conduct that took place subsequent to Bernard's death.  See Pls.' Br. at 49 ("[n]otwithstanding the tragic death of Bernard at the hands of Monroe Township and other agencies, Chief Berwick failed to even conduct any internal affairs investigation to determine what may have went wrong.").  Because the alleged constitutional violation in this case is the failure to send Bernard for medical evaluation, no

reasonable jury could find that Chief Berwick's conduct <u>after</u> Bernard's death contributed to this

violation. <u>See</u> <u>Bryan County</u>, 520 U.S. at 400 ("in enacting § 1983, Congress did not intend to

impose liability on a municipality unless deliberate action attributable to the municipality itself is

the 'moving force' behind the plaintiff's deprivation of federal rights."). Therefore, the municipal

defendants are entitled to summary judgment as to this claim.

Further, there is no evidence in the record demonstrating deliberate indifference on the

part of Chief Berwick as to the medical needs of detainees as it relates to the use of the medical

screening form. Plaintiffs summarily argue that "[w]ith deliberate indifference, Chief Berwick

failed to ensure that this policy was even implemented", <u>see</u> Pls.' Br. at 48, but fail to set forth

any evidence beyond this conclusion supporting deliberate indifference. Because this is a motion

for summary judgment, and a party opposing summary judgment must do more than just rest

upon mere allegations, or vague statements, the municipal defendants are entitled to summary

judgment. <u>Saldana v. Kmart Corp.</u>, 260 F.3d 228, 232 (3d Cir. 2001).

### *3) Remaining State Law Claims*

This Court has granted summary judgment for all Defendants on the federal causes of

action in this case brought pursuant to § 1983. Thus, the only remaining counts are state law

claims for negligence, gross negligence, wrongful death and survivorship. Once the claims over

which a district court has original jurisdiction have been dismissed, a court may decline to

exercise jurisdiction over supplemental state claims unless extraordinary circumstances exist. 28

U.S.C. 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a

claim under subsection (a) if - (3) the district court has dismissed all claims over which it has

original jurisdiction"); see Hedges v. Musco, 204 F.3d 109, 123 (3d Cir. 2000) (upholding district court's decision to refuse to exercise supplemental jurisdiction over remaining state law claims).

Because the federal causes of action have been dismissed and there are no circumstances compelling this Court to retain jurisdiction, the state law claims will be dismissed without prejudice, and, pursuant to 28 U.S.C. 1367(d), the statute of limitations for Plaintiff to bring such claims in state court will be tolled for thirty days after the date of dismissal.  Hedges, 204 F.3d at 123-24 (discussing tolling); L-3 Communs. Corp. v. Clevenger, 2004 U.S. Dist. LEXIS 17845 at *20 (E.D. Pa. Aug. 31, 2004) (stating that Plaintiff had 30 days to re-file in state court where court declined to exercise supplemental jurisdiction).

**CONCLUSION:**

For the aforementioned reasons, this Court holds that summary judgment is appropriate for both the individual and municipal Defendants in the above-captioned matter.   An appropriate Order will issue this date.

Dated: September 6, 2007                      s/Renée Marie Bumb
                                              RENÉE MARIE BUMB
                                              UNITED STATES DISTRICT JUDGE